IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMERANTH, INC. | ) |
| | ) |
| Plaintiff, | ) Civil Action No. __2:23-cv-2165__ |
| | ) |
| v. | ) **COMPLAINT FOR** |
| | ) **PATENT INFRINGEMENT** |
| DOORDASH, INC., | ) |
| EAT'N PARK RESTAURANTS, LLC, and | ) |
| EAT'N PARK HOSPITALITY GROUP, INC., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |
| | ) |

For its Complaint, Ameranth, Inc. ("Ameranth"), by and through the undersigned counsel, alleges as follows:

## THE PARTIES

1.     Ameranth is a Delaware corporation having a principal place of business at 5820 Oberlin Drive, Suite 202, San Diego, California 92121.

2.     Defendant DoorDash, Inc. ("DDI") is a Delaware company, with, upon information and belief, a brick-and-mortar store, called DashMart, located at 3232 Penn Avenue, Pittsburgh, Pennsylvania 15201, which has been open since 2021.

3.     DDI's Form 10-K at p. 28 for Fiscal Year 2022, which was signed February 24, 2023,  states that "[w]e face certain risks in connection with the operation of DashMart and Wolt Market, our first-party owned and self-operated convenience and grocery delivery businesses." (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001792789/6c80c6fa-ff0b-44e3-963b-a6c60669ff56.pdf (last accessed Dec. 20, 2023).

4.     The DoorDash website on which DashMart job openings are posted (https://careers.doordash.com) is also the website that provides investor information for the publicly traded DDI (https://ir.doordash.com/).

5.      On August 5, 2020, DDI announced:  "DashMart stores are owned, operated, and curated by DoorDash."  Introducing DashMart, Aug. 5, 2020 (available at https://about.doordash.com/en-us/news/introducing-dashmart (last accessed Dec. 20, 2023).

6.      Defendant Eat'N Park Restaurants, LLC is a Pennsylvania company, with upon information and belief, a place of business located at 285 East Waterfront Drive, Homestead, Pennsylvania 15120.

7.      Defendant Eat'N Park Hospitality Group, Inc. is a Pennsylvania company, with upon information and belief, a place of business located at 285 East Waterfront Drive, Homestead, Pennsylvania 15120.

8.      Defendants Eat'N Park Restaurants, LLC and Eat'N Park Hospitality Group, Inc. are collectively referred to herein as "Eat'N Park."

9.      Defendant DDI and Eat'N Park are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

10.      This action arises under the Patent Act, 35 U.S.C. § 1 *et seq.*

11.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338.

12.      Upon information and belief, Defendants conduct substantial business in this forum, directly and/or through intermediaries,  including:  (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals in this district and otherwise directs infringing activities to this district in connection with its products and services.  DDI's staff operating at and from its DashMart store in Pittsburgh use products and services that are accused of infringement herein. The same is true of the hundreds of DDI's

2

Delivery Driver Dashers operating within this district.  Eat'N Park's staff operating at and from its restaurant in Pittsburgh use and integrate with DDI products and services that are accused of infringement herein. That Eat'N Park  restaurant and/or other physical locations within this district clearly establish venue in this district for both Eat'N Park and DDI.

13.     The same accused products and services are also integrated with, upon information and belief, more than seven hundred other restaurants/stores operating within this district, *see* Food Delivery in Pittsburgh (available at https://www.doordash.com/food-delivery/pittsburgh-pa-restaurants/ (last accessed May 1, 2023), and with tens of thousands of Pittsburgh area consumers within this district, using DDI's mobile application and supported by a Pittsburgh, Pennsylvania-based engineering team, that  is focused on activities directly related and contributing to the infringement allegations herein:  DDI "focused on core platform technologies that drive our delivery logistics platform and solve some of our team's largest distributed systems challenges." Brian Bailey, "Pioneering DoorDash's Platform Evolution in Pittsburgh," Oct. 21, 2021 (available at            https://doordash.engineering/2021/10/21/pioneering-doordashs-platform-evolution-in-pittsburgh/ (last accessed Apr. 2, 2023)); *see also* "DoorDash to make regional debut with DashMart convenience concept on Penn Avenue in Lawrenceville," Sept. 22, 2021 (available at https://www.wpxi.com/news/business/doordash-make-regional-debut-with-dashmart-convenience-concept-penn-avenue-lawrenceville/RGRKTXADZVAKZB6GYOV44WO6NA/ (last accessed Apr. 3, 2023)).

14.     While DDI announced on January 20, 2023, the cancellation of its planned physical engineering office within this district, the announcement itself admits to infringing activity within this district, including its engineering talent hub in the Pittsburgh area, and admits to its continuing to hire engineers within this district, which it has continued to do and still is doing today:

> "We have chosen not to open an office in Pittsburgh at this time," she said. "That said, we do have engineers in Pittsburgh, and are enthusiastic about talent there."
>
> She further emphasized how "DoorDash's flexible work model allows employees to work from wherever is most convenient to them and has enabled us to grow our engineering talent across the U.S., including in Pittsburgh."
>
> The company expects to continue to grow its staff in western Pennsylvania, she added: "DoorDash remains enthusiastic about our plans to grow our talent hub in the Pittsburgh area."
>
> DoorDash's "hub" will likely be figurative now, of course, as the company continues to seek to recruit Pittsburgh engineering talent.

Tim Schooley, "DoorDash opts against establishing Pittsburgh office, instead staying remote with local engineering team," Jan. 20, 2023 (available at https://www.bizjournals.com/4ittsburgh/news/2023/01/20/doordash-engineering-office-pittsburgh.html?utm_campaign=manual&utm_medium=trueAnthem&utm_source=linkedin (last accessed Dec. 20, 2023)).

15.     DDI also has an "Engineering Leader" in Pittsburgh, Pennsylvania. https://www.linkedin.com/in/mranney (last accessed Apr. 3, 2023), and the Pittsburgh engineering team includes numerous data scientists, software programmers, operations research scientists, partner integrators, computer scientists and more working on all or almost all aspects of the products and services accused herein of infringement.  He and, upon information and belief, other DDI employees located in this district are working on the products and services accused of infringement herein.  Further, their technical work within this district clearly provides them access to all of the relevant DDI engineering evidence/information.

16.     Further, the Pittsburgh engineering team is a centralized platform team that is contributing to "all aspects of DoorDash's products and internal services":

## Pittsburgh Engineering Teams

**Platform Evolution** is a newly formed engineering team and will be the first (of many) teams to be located in Pittsburgh. As previous blog posts have discussed, the DoorDash engineering team has been focused on transitioning away from a monolithic codebase to a microservices architecture. This new team represents the next phase in this transformation. In addition to having our product teams focus on the migration, we'll also be staffing a fully dedicated team. Platform Evolution will be responsible for building the core platform components to enable a seamless migration, while also ensuring we are able to increase capacity and expand to new global markets. As a centralized platform team, our software engineers will have the opportunity to contribute to all aspects of DoorDash's products and internal services.

Brian Bailey, "Pioneering DoorDash's Platform Evolution in Pittsburgh," Oct. 21, 2021 (available at https://doordash.engineering/2021/10/21/pioneering-doordashs-platform-evolution-in-pittsburgh/ (last accessed Dec. 20, 2023)).

17.     DDI has stated that "Employees are encouraged to gather in person for . . . 'moments that matter': product launches, hackathons, team meetings, planning sessions, decision-making and all-hands gatherings."  DDI spokesperson interview, "Remote work or not? How 4 Bay Area companies are tackling the post-pandemic workplace, Nov. 7, 2022 (available at https://www.sfchronicle.com/tech/article/remote-work-bay-area-17559854.php (last accessed Dec. 20, 2023).  DDI thus directs, ratifies or establishes in person/team meetings involving members of teams who are employees of DDI, including the Pittsburgh-located DoorDash Platform Engineering Team.  The location(s) of these meetings within this district are regular and established places of DDI's business because they are used to conduct business of DDI including, *inter alia*, conducting engineering activities at DDI's direction and for DDI's benefit.

18.     By seeking employees specifically for and in its Pittsburgh location, DDI requires its engineering team members to be located in the Pittsburgh area, thus to maintain employment

the employee is not free to move out of the Pittsburgh area.  DDI requires the pertinent engineering team members to perform their job functions in the Pittsburgh area, otherwise it would not be specifying "Pittsburgh, PA" in its job postings.  Since the employees work at their own homes in the Pittsburgh area and not in an office provided by DDI, DDI has established or ratified the employees' homes as DDI's places of business.  The employees' homes are regular and established places of DDI's business because they are used to conduct business of DDI including, *inter alia*, conducting engineering activities at DDI's direction and for DDI's benefit.  For example, at least one Pittsburgh team member, Matt Ranney, the team leader, has used his home office to not only conduct company business, but also to publicly represent DDI nationwide on technical subject matter directly related to the infringements alleged herein, thus clearly establishing his home office location as a DDI physical place of business in this district.  *See* Building Reliable Systems With DoorDash's Matt Ranney (Mar. 27, 2023) (available at https://www.youtube.com/watch?v=6nIuDNJeE4g (last accessed Dec. 21, 2023)).

19.     Members of the DoorDash Platform Evolution Engineering Team, as well as other engineering teams, as discussed above, are (both individually and collectively) located in Pittsburgh pursuant to DDI's requirement and perform functions directed to DDI's business (in the employees' homes or elsewhere in the Western District of Pennsylvania).  The employees' individual and collective activities at DDI's direction separately establish venue over DDI.

20.     As is stated above, in addition to the engineering team in Pittsburgh, which is focused on the platform/framework technology of the Ameranth's patent claims as explained and admitted below, DDI also employs hundreds of delivery Dashers, throughout the district, all of which use technology that is accused of infringement herein and which is implemented within DashMart in Pittsburgh, as well as, upon information and belief, more than seven hundred stores

and restaurants operating within this district and all of which are integrated with tens of thousands of consumers, each equipped with DDI's mobile application, and all of which are operating together and within this district.

21.     Venue is thus proper in this district pursuant to the second clause of 28 U.S.C. § 1400(b) which states venue is appropriate "where the defendant has committed acts of infringement and has a regular place of business."

**THE PATENTS-IN-SUIT**

22.     On December 12, 2023, U.S. Patent No. 11,842,415 (the "415 patent"), entitled "Intelligent Web Server With Multi-Modes of Contact, Multi-Communications Protocols, Multi-User and Parallel Operational Capabilities for Use in a Hospitality Market Comprising," was duly and lawfully issued by the U.S. Patent and Trademark Office.  A true and correct copy of the '415 patent is attached hereto as Exhibit A.

23.     On December 19, 2023, U.S. Patent No. 11,847,587 (the "587 patent"), entitled "Intelligent Backoffice and Handheld/Mobile Computing Network With Varying, Multi-Modes of Contact, and Parallel Capabilities for Use in Completing Remotely Initiated Hospitality Tasks in the Hospitality Market Comprising:," was duly and lawfully issued by the U.S. Patent and Trademark Office.  A true and correct copy of the '587 patent is attached hereto as Exhibit B.

24.     Ameranth is the assignee and owner of the rights, titles and interests in and to the '415 and '587 patents (the "Network Patents"), including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them.

25.     Claims 1 and 9 of the '415 patent are as follows:

1.  An improved and intelligent web server computer with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities for use in a hospitality market comprising:

        at least one said web server computer which can be accessed, controlled and

provide results, statistics and/or reports to a system administrator via a web based interface;

at least one hospitality software application integrated with the at least one said web server computer;

a master database comprising data and parameters of the at least one hospitality software application integrated with the at least one said web server computer and with a usable file structure dictated prior to execution, thus improving efficiency and reliability, the master database being accessible via a database application program interface (API) and with predefined formats stored within it, wherein the API intelligently learns, updates and stores multiple communication modes of contact and related operational parameters including set periods of time or reflecting other factors associated with hospitality entities and/or hospitality users along with their prior preferences, if any;

Middleware/Framework Communications Control Software, (MFCCS) which enables via its centralized system layer architecture the at least one web server computer to communicate with two or more different wireless handheld computers, each with different mobile operating systems and with mobile compatible versions of the said hospitality application accessible from and with a different set of handheld GUI screens uniquely enabled for both user initiating actions and later selection of choices directly on and from the touchscreens of said different wireless handheld computers and for multiple modes of contact, multiple communications protocol functionality, integrated with the master database and with the at least one hospitality software application;

at least one external software API, which enables the integration of the at least one hospitality software application via the MFCCS and its layer architecture with one or more non- hospitality applications and to enable real time searches for communication modes of contact and/or related operational parameters, not already stored and available in the master database, if any;

wherein the at least one said web server computer is integrated with the MFCCS and is programmed with instructions executable to choose and apply a primary communications mode of contact, for and with the hospitality entities and/or users, for a period of time, to execute hospitality application task requests from said two or more wireless handheld computers associated with their respective users, and further enabled to automatically choose and execute alternate communication modes of contact and/or alternate communications protocols if needed and appropriate at the time of execution upon failure of the primary communications mode of contact, and/or apply rule based intelligence to not attempt again for an operational period of time the primary communication mode, the instructions being further executable to enable the at least one said web server computer to further improve its efficiency by using less computer resources and less computing time through the avoidance of attempting communications modes of contact to hospitality entities and/or users and/or for subsequent user

hospitality application task requests, likely to fail during the operational period of time if attempted again during that time.:

9. A network of interconnected, intelligent and improved web server computers with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities for use in a hospitality market comprising; [*sic*]

at least one network of said interconnected web server computers which can be accessed and controlled by system administrators via a web based interface;

at least one hospitality software application integrated with the at least one said web server network;

a master database comprising data and parameters of the at least one said hospitality software application integrated with the at least one said network of web server computers and with a usable file structure dictated prior to execution, the master database being accessible via a database application program interface (API) and with predefined formats stored within it, thus improving network efficiency and reliability, wherein the API intelligently learns, updates and stores inventory data and/or multiple communication modes of contact and related operational parameters associated with hospitality entities and/or hospitality users along with their prior preferences, if any;

Middleware/Framework Communications Control Software (MFCCS) which enables via its centralized system layer architecture the at least one said web server network to communicate with two or more different wireless handheld computers each with different mobile operating systems and with a different set of handheld GUI screens uniquely enabled for both user initiating actions and later selection of choices directly on and from the touchscreens of said different wireless handheld computers and for multiple modes of contact, multiple communications protocol functionality, integrated with the master database and with the at least one hospitality software application;

at least one external software API, which enables the integration of the at least one hospitality software application via the MFCCS with one or more non-hospitality application and to enable access to information not already stored and available in the master database;

wherein the at least one web server network is integrated with the MFCCS and is programmed with instructions enabled to choose and apply a communications mode of contact for and with the hospitality entities and two or more different communications modes of contact during the same hospitality task with handheld users to execute hospitality application task requests with a first hospitality entity from said wireless handheld computers associated with their respective users, and further enabled to automatically choose and execute with alternate hospitality entities when inventory is learned to be unavailable at a first hospitality entity and then improve efficiency by applying rule based intelligence

to not attempt again such a request with the first hospitality entity for a subsequent user request, now known by the interconnected web server network as to be unavailable to enable the web server network to use less computer resources and less computing time through the avoidance of attempting communications modes of contact to hospitality entities known in advance to fail to meet the subsequent user requests.

Exhibit A at 21:41-22:42, 43:4-67.

26.     Claims 1 and 7 of the '587 patent are as follows:

1. An intelligent backoffice and handheld/mobile distributed computing network with varying, multi-modes of contact, and parallel operational capabilities for use in completing remotely initiated hospitality tasks in the hospitality market comprising:

a network of distributed and linked backoffice servers that are continuously synchronized in real time and which are enabled to be remotely accessed and managed by a system administrator via a web based interface;

one or more hospitality software applications linked with the backoffice servers and with handheld/mobile compatible versions available to be remotely accessed and used by handheld/mobile equipped users and including two or more different handheld/mobile computers with their respective and different mobile operating systems;

a master database comprising multiple linked and continuously synchronized in real-time databases throughout the network and with data and parameters of the one or more hospitality software applications integrated with the said network and with predefined formats, the master database comprising a usable file structure dictated prior to execution, thus improving efficiency and reliability, wherein the one or more hospitality software applications learn, update, store and intelligently apply varying modes of contact with the handheld/mobile equipped hospitality users and in accordance with their preferences, if any;

Middleware/Framework Communications Control Software (MFCCS) which enables via its centralized system layer architecture the parallel operations capable network to communicate with said two or more different wireless handheld computers, each with different mobile operating systems and with mobile compatible versions of the said hospitality application accessible from the back office servers;

at least one external software application program interface (API), which enables the full integration of the one or more hospitality software applications via the MFCCS and its layer architecture with one or more non-hospitality applications;

additionally the network is further enabled to automatically contact one or

more other entities when the remotely initiated hospitality task cannot be completed with a first entity and to intelligently continue this, until the task is completed;

additionally the network is further enabled to intelligently apply time constraints and/or hold times, associated with the hospitality task, when applicable;

wherein the parallel operations capable network is integrated with the MFCCS and the backend servers are programmed with instructions executable to choose and apply varying modes of contact during the same remotely initiated hospitality task, for and with the handheld/mobile customers and/or handheld/mobile equipped entity staff, to intelligently execute and support completion of the hospitality application task requests.

7. An intelligent backoffice and handheld/mobile distributed computing network with varying, multi-modes of contact, and parallel operational capabilities for use in completing remotely initiated hospitality tasks in the hospitality market comprising:

a network of distributed and linked backoffice servers that are continuously synchronized in real time and which are enabled to be remotely accessed and managed by a system administrator via a web based interface;

one or more hospitality software applications linked with the backoffice servers and with handheld/mobile compatible versions available to be remotely accessed and used by handheld/mobile equipped users and including two or more different handheld/mobile computers with their respective and different mobile operating systems;

a master database comprising multiple linked and continuously synchronized in realtime databases throughout the network and with data and parameters of the one or more hospitality software applications integrated with the said network and with predefined formats. the master database comprising a usable file structure dictated prior to execution, thus improving efficiency and reliability, wherein the one or more hospitality software applications learn, update, store and intelligently apply varying modes of contact with the handheld/mobile equipped hospitality users and in accordance with their preferences, if any;

Middleware/Framework Communications Control Software (MFCCS) which enables via its centralized system layer architecture the network to communicate with said two or more different wireless handheld computers, each with different mobile operating systems and with mobile compatible versions of the said hospitality application accessible from the backoffice servers;

at least one external software application program interface (API), which enables the full integration of the one or more hospitality software applications via the MFCCS and its layer architecture with one or more non-hospitality applications;

additionally, the network is further enabled to automatically communicate

11

alerts to the handheld/mobile equipped management staff when corresponding criteria are met;

wherein the network is integrated with the MFCCS and the backend servers are programmed with instructions executable to choose and apply varying modes of contact during the same remotely initiated hospitality task, for and with the handheld/mobile customers and/or handheld/mobile equipped entity staff, to intelligently execute and support completion of the hospitality application task requests.

Ex. B at 21:44-22:33, 22:53-54:8.

27.     A person of ordinary skill in the art ("POSITA") at the time of the inventions of the

Network Patents would be:

someone with a bachelor's degree in computer science, industrial engineering, operations research, or related field, and either (1) two or more years of relevant industry experience for hospitality applications and/or (2) an advanced degree in computer science, industrial engineering, operations research, or related field. This description is approximate, and more work experience could compensate for less education or more education could compensate for less work experience.

Ex. C at ¶ 16.

28.     "The purpose of claim construction is to give claim terms the meaning understood

by a person of ordinary skill in the art at the time of the invention." *Mass. Inst. of Tech. v. Shire

Pharms., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016).

29.     Ameranth hereby proposes and officially adopts the below claim constructions, all

of which are viewed through the eyes of a POSITA, as defined above. The claim constructions

applicable to some or all of the claims of both the '415 and '587 patents are presented first and two

additional claim constructions unique to the '587 patent are presented second; the same terms

appearing in both patents are to have the same meanings and same constructions:

| Claim Terms/Phrase | '415 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| "web server computer" | all | any machine capable of running or executing server software that uses HTTP to serve up HTML documents and any associated files and |

| Claim Terms/Phrase | '415 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| | | scripts when requested by a client, such as a Web browser<br><br>Evidence:  Microsoft Computer Dictionary (5th ed. 2002) at p. 260); Exhibit C at ¶ 38; https://www.pcmag.com/encyclopedia/term/web-server (last accessed Dec. 20, 2023); '415 patent at 17:40-42 |
| "said web server computer" | all | an improved and intelligent web server computer with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities<br><br>Evidence:  Preamble of claim 1; Exhibit D at pp. 9-12<br><br>This is an ordered combination defined and limited by the anteceding and limiting, first element of the claim preamble and with all terms non- conventionally arranged and integrated to improve the web server computer |
| "multi" | all | two or more |
| "modes of contact" | all | communication options including e.g. telephone calls, web pages, emails, pages, facsimiles, instant messages, and text messages<br><br>Evidence:  '415 patent at Figure 10, 14:44-56, 15:25-16-9, 15:52-55, 16:27-36, 17:38-51, 17:59-62; Exhibit D at pp. 9-12 |
| "parallel operational capabilities" | all | parallel processing of related operational parameters to improve the performance of the web server<br><br>Evidence:  Microsoft Computer Dictionary (5th ed. 2002) at p. 391; '415 patent at 16:8-21, 17:38-51, 17:59-18:6, 18:32-35; Exhibit D at p. 9 |
| "related operational parameters" | | a set of operational criteria or rules related to the modes of contact and associated with the hospitality entities and for remote hospitality users, such as e.g. periods of time,, alternate |

| Claim Terms/Phrase | '415 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| | | modes, multi-thread communications, restaurant inventory/menu options that are set aside for one or more particular purposes, location, type and/or price range |
| | | Evidence: '415 patent at 13:61-66, 13:65-14:5, 15:52-55, 17:38-51, 15:66-16:2, 16:55-17:15, 18:14-21, 32-35; Exhibit D at pp. 2, 10 |
| "along with their prior preferences" | all | a set of corresponding operational criteria such as e.g. their order history, one or more orders of restaurants as to user ranking, and/or most desirable, in accordance with previously established (e.g. stored) user unique lists, via database lookups, with matches to search criteria, with only one, multiple or all of selected entities/preferences |
| | | Evidence: '415 patent 14:10-28, 15:66-16:2, 16:55-17-15, 18:14-21; Exhibit D at p. 10 |
| "intelligence" | all | the ability of a program to monitor its environment and initiate appropriate actions to achieve a desired state. For example, a program waiting for data to be read from disk might switch to another task in the meantime |
| | | Evidence: '415 patent at 10:51-55, 15:62-16:7, 16:13-21, 16:41-43, 16:64-17:7; Microsoft Computer Dictionary (5th ed. 2002) at p. 278, Def. 2 |
| "learning and rule based intelligence" | all | applying intelligence to include concurrently with pre-established and/or developed rules, e.g. applying or not applying a mode of contact, dependent on related operational parameters and/or prior preferences |
| | | Evidence: '415 patent at 10:51-55, 15:62-16:7, 16:13-21, 16:41-43, 16:64-17:7, 17:9-19, 17:42-51; Microsoft Computer Dictionary (5th ed. 2002) at p. 278, Def. 2 |

| Claim Terms/Phrase | '415 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| "network of said interconnected web server computers" | 9-20 | a network of interconnected, intelligent and improved web server computers with multi modes of contact, multi communications protocols, multi user and parallel operational capabilities<br><br>'415 patent at 14:58-63, 18:22-30, 18:48-60, Figure 10; *see also* definitions for "interconnected," "storage area network," and "system area network" in Microsoft Computer Dictionary (5th ed. 2002) at pp. 278, 498, 499<br><br>This is an intelligent ordered combination defined and limited by the anteceding and limiting, first element of the claim preamble and with all terms non-conventionally arranged and integrated to improve the web server computer and the overall network. |

| Claim Terms/Phrase | '587 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| "a network of distributed and linked backoffice servers" | all | an intelligent back office and handheld/mobile distributed computing network with varying, multi modes of contact, and parallel operational capabilities, and which is continuously synchronized along with its master database in real time<br><br>Evidence:  Preamble of claims 1 and 7, first element of claims 1 and 7; '587 patent at 14:57-63, 18:23-31, 18:49-61, Figure 10 and as is further defined in/by the sub/related definitions above as to the '415 patent and including these below too<br><br>This is an intelligent ordered combination defined and limited by the anteceding and limiting, first element of the claim preamble and with all terms non- conventionally arranged and integrated to improve the overall network. |

| Claim Terms/Phrase | '587 Patent Claim Nos. | Proposed Construction with Supporting Evidence |
|---|---|---|
| "distributed computing network" | all | a network in which processing, storage, and other functions are handled by separate units (nodes) rather than by a single main computer<br><br>Evidence:   '587 patent at 14:57-63, 18:23-31, 18:49-61, Figure 10;   Microsoft Computer Dictionary (5th ed. 2002) a p. 168 |

## AMERANTH BACKGROUND

30.     Inventor and current President Keith McNally founded Ameranth in 1996 to develop and provide innovative wireless, real-time communications technology and associated computer software and hardware systems that would enhance the efficiency of hospitality-focused enterprises such as hotels, restaurants, entertainment and event ticketing venues and similar establishments. Ameranth successfully developed and deployed its products/systems to many thousands of locations, including several of the world's largest restaurant and hotel chains, won more than ten important technology awards for its technology and has licensed its patents to more than 47 different companies.

31.     Ameranth's inventions and development of these systems has already resulted in the issuance by the USPTO of ten patents: 6,384,850 (the "'850 patent) (issued 2002), 6,871,325 (the "'325 patent") (issued 2005), 6,982,733 (the "'733 patent") (issued 2006), 8,146,077 (the "'077 patent") (issued 2012), 9,009,060 (the "'060 patent) (issued 2015), 9,747,651 (the "'651 patent") (issued 2017), 10,970, 797 (the "'797 patent) (issued 2021), the '130 patent (issued 2022), the '415 patent (issued 2023), and the '587 patent (issued 2023).  Further, one additional patent application is pending in this patent family, with this additional patent expected to issue later in 2024.

32.     The 2023-issued Network Patents are directed to Ameranth's new parallel-operational-capable, web server network and distributed computing-based patent family, based

upon the new and expanded teachings disclosed in the July 26, 2005 patent application, which is a continuation-in-part of the '077 patent. The claims of the Network Patents are not directed to formatting and synchronizing a graphical user interface (GUI) with wireless handheld computers, as is further explained below.

33.     After the issuance of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), regarding patent-eligibility (35 U.S.C. § 101), many claims of the '850, '325, '733, '077 and '651 patents were found ineligible by the Patent Trial and Appeal Board or district courts, and then affirmed to be so by the Federal Circuit in three different rulings, *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (2016), *Ameranth, Inc. v. Domino's Pizza, LLC*, 792 Fed. Appx. 780, 788 (2019); and *Ameranth, Inc. v. Olo Inc.*, No. 2021-1211, 2021 WL 4699180 (Fed. Cir. Oct. 8, 2021).

34.     *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), has been widely acknowledged to be confusing and difficult to apply, including by twelve judges of the Federal Circuit and the U.S. Solicitor General.

35.     On April 5, 2023, in response to U.S. Supreme Court orders inviting the Solicitor General to express the views of the United States in two cases involving 35 U.S.C. § 101, the U.S. Solicitor General in conjunction with the Solicitor at the U.S. Patent and Trademark Office again confirmed the confusion surrounding patent-eligibility and the need for the law to be clarified. Brief for the United States as Amicus Curiae, *Interactive Wearables, LLC v. Polar Electro Oy*, No. 21-1281 (filed Apr. 5, 2023); Brief for the United States as Amicus Curiae, *Tropp v. Travel Sentry, Inc.*, No. 22-22 (filed Apr. 5, 2023).

36.     All claims of the Network Patents are materially different from those prior invalidated claims.  While the invalidated claims were directed to graphical user interfaces and/or synchronizing displays, the claims of the Network Patents are clearly directed to the improved,

networked and intelligent web server computer as well as to intelligent and distributed computing networks. The Network Patents' claims are explicitly directed to improving the claimed, backend web server computer, with multiple new and non-conventional inventive concepts, and with the technical improvements and the "how" specifically included and in several instances stated as so within the claims themselves – and supported by and resulting from the extensive new inventive teachings and new material disclosed in the July 26, 2005 continuation-in-part application and Figure 10. The issuance of the Network Patents' claims are the second and third of Ameranth's new parallel-operational-capable, web server computer-based network and master distributed database/computing-based patent family but include further inventive concepts and specific technological features.

37.     Further as is discussed and confirmed in detail below, DDI and its inventors copied many of the 2005 inventive concepts of the Network Patents into newly issued patents (claimed for and issued to DDI in 2023) while concurrently claiming those copied innovations and advancements were new, novel, nonconventional, and improvements to computers despite their having inventive priority dates more than 15 years after Ameranth had already invented and deployed them in 2005. Thus these are all admissions that Ameranth's 2005-based innovations were and are (i) not abstract, (ii) nonconventional, and (iii) improvements to computers and networks.

## TECHNOLOGY BACKGROUND

### a.  Technological Problems in 2005

38.     Ameranth incorporates in its entirety the Declaration of Keith R. McNally Regarding: U.S. Patents: 11,842,415 and 11,847,547 ("McNally Decl."), attached hereto as Exhibit E, into the pleadings here.

39.     As explained by Mr. McNally, the inventor and a person of ordinary skill in the art, in early 2005, Ameranth was presented with two new, strategic opportunities, one from Holiday Inn Hotels of Intercontinental Hotels Group (IHG) (the world's largest hotel company) and the other from Zagat Survey LLC (the world's largest restaurant rating/ranking company).  These enterprise level opportunities presented new and unprecedented technological challenges to Ameranth in 2005.  Ameranth recognized they needed that which was non-conventional and which did not exist at the time—a full, intelligent, enterprise level, web server computer-based back end solution/service with parallel operational capabilities and multi modes of contact. That these technology improvements were new, nonconventional, and did not exist prior to 2005 is evidenced and confirmed by the sworn statement of Mr. McNally and the fact that IHG and Zagat management sought Ameranth to develop what clearly did not then exist in 2005; had the technology existed, these industry giants would have simply used it, yet they retained Ameranth to develop it. .

40.     Ameranth's eHost platform deployed for Holiday Inn incorporated key aspects of the inventions claimed in the '415 and '587 patents.  McNally Decl. at ¶¶ 14-17.

41.     Several of the features claimed in the Network Patents were also incorporated into Ameranth's Magellan Restaurant Reservations System in November 2005.  McNally Decl. at ¶¶ 18-19.

42.     Mr. McNally invented a new, unique and ordered combination of technologies that improved web server computers, including an internet-based web server/cloud-based datacenter/hosted system with distributed computing, and the new and non-conventional multi-modes of contact and parallel operational capabilities' functionality, and  its layered architecture and with distributed but linked databases, yet operating together as a master database and which

learns, was intelligent and chooses/acts/decides intelligently.  This ordered-combination-based invention improving web server computers is what is claimed in the Network Patents.  As is confirmed in his declaration, the Network Patent's new multi-modes of contact to/with either or both wireless handheld equipped consumers/customers and with the restaurants/hotels, solves technological problems by providing resiliency, flexibility and reliability, and its internal and external API's accommodate and integrate with current and future hospitality and non-hospitality external systems.

43.    With national scale, hosted, web server computer-based deployments and the requirements for extreme reliability, the 24x7x365 availability of the system across thousands of locations, and enabled for multiple and linked web server data centers to prevent the system from going down due to a power outage or other such failure mode, consequently, the distributed computing and claimed master database while acting intelligently approaches with the layered Middleware/Framework Communications Control Software (MFCCS) architecture and framework as is shown in Figure 10 of the Network Patents and with seamless interconnectivity was essential.

44.    Because speed/time to market was also a high priority, Ameranth was also challenged to develop interim solutions if required—while deferring, when/if appropriate to later versions—any integrations or special features not essential for the initial, primary operational features/objectives.  This required planning and integrating the layered architecture shown in Figure 10 of the Network Patents and external API into the MFCCS system framework/design  to provide for continual growth and considerations into the overall system framework/architecture. At the time of the inventions claimed in the Network Patents, no such integrated system or system of systems existed.

45.    The claimed inventions of the Network Patents and their new technical and intelligent solutions preceded what later and more currently have become known as e.g. machine learning and/or a microservices-based architectural approach.  McNally Decl. at ¶¶ 13, 25-26.

46.    After conceiving the advances, innovations and new, web server based  architecture that powered and enabled these new systemic solutions in late 2004 into early 2005, Mr. McNally filed a continuation-in-part patent application on July 26, 2005, providing extensive new teachings/guidance to persons of skill in the art to expand upon the earlier teachings/disclosures of his original patent specification, filed on September 21, 1999.  The teachings were and are targeted to teach new advancements on the back end and architectural side of the systems.   This continuation-in-part application is the parent to the Network Patents.

47.    Mr. McNally added text about some additional functionality at the end of the prior Abstract, emphasizing the importance of new enhancements supporting the multiple modes of contact enhancements, he modified the primary prior systemic architecture Figure 9 into Figure 10, and he added a short addition to the prior specification (see '415 patent at 5-9; '587 patent at 13: 5-9), but then focused on the extensive new 2005 systemic and architectural innovations disclosed in the '415 patent at 13:34 to 18:60; '587 patent at 13:34 to 18:61.

48.    The advantages of and extensive new teaching/explaining in columns 13-18 of the '415 and 587 specifications via non-software language specific examples evidence the multiple modes of contact advancement/concept, because a person of ordinary skill in the art can follow the example based specification teachings and then at the appropriate time and in the appropriate programming language as of that date or any date program/code this functionality in the software language then preferred and used.  This enhancement of the multi-modes of contact improved the web server functionality as part of the overall framework design and was/is essential to achieving

the system reliability and autonomous enterprise level functionality, as was required for both the eHost and Magellan systems.  Without such functionality combined with the learning/intelligence of the system, the first instance of a communication failing and/or being unanswered would immediately end that communication flow and prevent that hospitality task from being timely completed, thus degrading the system and its reliability and reducing merchant/customer satisfaction. Further, once the system learns that e.g. a particular contact mode is ineffective, it can then avoid even trying that and thus eliminate that wasted computer resource and increase the system's efficiency.  This new learning and intelligence functionality and its application as in the Network Patents' claims was new, non-conventional and improved the efficiency of prior web servers and the overall connected network by eliminating computer resources previously wasted on actions (that were not required toward the claimed requirement of completing the hospitality tasks as in the Network Patent's claims) and by eliminating these wasted actions, less computing resources were required; thus improving CPU processing and efficiency.  Of special importance to the multiple modes of contact were included in the Network Patents' claimed invention, in late 2004, that integrating text and chat into actual deployed/operational systems would offer technical and operational benefits. This was a new and important innovation since at this time, texting (while loved by teenagers) was scorned by most adults, but its limited use was a stand-alone function, not actually integrated directly into an operational system and the execution and completion of hospitality tasks.  Mr. McNally was the first to recognize this and actually teach the ability to integrate texting/chatting functionality into deployed and operational hospitality task based systems and make them, optionally a part of the completion of those tasks when/where appropriate, as evidenced by the disclosure and claims of the Network Patents patent. McNally Decl. at ¶¶ 24-25, 27.

49.      As Mr. McNally further and first recognized, and which is specifically taught in the continuation-in-part additions of and claimed in the Network Patents to achieve and teach the overall systemic enhancements to prior web server computer-based systems while providing a totally integrated, hosted, ordered combination systemic solution and one capable of interfacing with wireless handheld computers and via multiple modes of contact, along with the framework and layered approach of Figure 10 of the Network Patents, the claims and teachings of the Network Patents guide/teach a person of skill in the art to pursue/architect a distributed computing, distributed-but linked database system, which mirrors and teaches the new systemic framework approach, as a new and ordered combination which now, many years later is often now deemed as a microservices-based approach. '415 patent at 14:57-63, 16:64-17:2, 18:24-30, 18:32-55, Fig. 10; '587 patent at 14:57-63, 16:65-17:3, 18:25-31, 18:33-36, Fig. 10.

50.      As explained in Mr. McNally's declaration:

23.  In order to best teach/explain these new innovations and enhancements to prior web server based systems to persons of skill in the art, such as myself, I decided to adopt and apply a 'pseudo code', and 'by way of example' teaching approach - relying on a 'three way' example baseline/approach, of the interactivity between the 'computer', i.e. the improved back office/web servers and with the 'the users', 'the entities' and their bi-directionally 'back and forth' actions/communications, describing and teaching the new enhancements via <u>45 examples</u> and which was/is clearly explained to a POSA below.

I chose a reservations embodiment, to illustrate the new innovations, however the new inventive concepts apply to all hospitality embodiments.

'Such functionality may be implemented in a number of ways. So <u>as to illustrate</u> **by way of example**, employing such functionality in the making of appointments and/or reservations will be discussed.'  '415 patent, Col 13, lns 41-434-47; '587 patent, Col. 13, lns 44-47.)

This 'examples' teaching approach, (including the pseudo code instructions where appropriate) was the best teaching approach of the how, since with ever changing software languages, and the likelihood that multiple/different languages would be used, on/with different elements of the overall integrated framework/system and even with varying databases types and interfaces, this was the optimal approach. Providing source code in a single/particular

> programming language that would likely soon be obsoleted, would not have stood the test of time, nor offered a viable technical teaching, whereas providing pseudo code guidance and 'examples' which are independent of a special/unique software language optimized the teachings for a person of skill in the art, and ensured broad teaching applicability.

McNally Decl. at ¶ 23.

51.     The advantages of the pseudo code approach are further and independently confirmed in Exhibit 7 to the McNally Decl.:

> Developing computer programs, especially ones as large and complex as operating systems or corporate data systems, is a difficult job. There are many opportunities for developers to make mistakes, create unintentional complexity, or simply lose their way. Pseudocode is an incredibly useful tool in the developer's toolbox, helping her avoid many of the pitfalls that plague such a complex undertaking.

> Pseudocode is plain text and therefore easy to understand. Because it does not require the rigid structures and syntax of a programming language, it does not require a special editing environment. Pseudocode can also be understood by nonprogrammers, allowing developers to bring experts with no computer knowledge into the creative loop, benefiting from their input and allowing the developer to create software that is even more useful for their clients.

> Because pseudocode is not itself an actual programming language, it can be used with almost any available programming language. This is a great boon to developers, who often have the ability to use a variety of languages.

52.     A distributed database is a database that is distributed across multiple computers and devices in a network.  Such an architecture can provide tremendous benefits for users.  As would be well-known to a POSITA prior to 2005 and prior to the new and non-conventional Network Patents' claimed inventions, however, there were significant challenges for system designers to be able to successfully implement such a distributed database.  For example, a major challenge is that of achieving the design goals of consistency, availability, and partition-tolerance:

- **Consistency**. Consistency means that all devices on the network see the same data at the same time. For this to happen, whenever data is written to one node, it must be immediately forwarded and replicated to all the other nodes in the system before the

write is deemed successful.

- **Availability**. Availability means that that any device making a request for data gets a response, even if one or more other nodes are down. Another way to state this is that all working nodes in the distributed system return a valid response for any request.

- **Partition-tolerance**. A partition is a communications break within a distributed system, such as a delayed or disconnected link between nodes, that disconnects one or more nodes from other nodes in the network. Partition-tolerance means that a cluster of nodes must continue to work despite any communication breakdowns between nodes in the system.

**b. The Network Patents' Claimed Inventions Solved These Technological Problems With Technical Solutions And Improvements**

53.     These 2005 operational challenges required an entirely new systemic technical approach/solution including parallel operational capabilities and one which operated as an ordered combination of technical advancements to create an intelligent and integrated internet enabled system that met all of these requirements and more, while designed for growth/expansion as well. As claimed and disclosed in the Network Patents, a MFCCS-based layered framework/architecture upon which the pieces of the system would be integrated together was needed.

54.     The inventions claimed in the Network Patents are vastly different from the claimed inventions in Ameranth's earliest patents.  Unlike the claims in Ameranth's earliest patents, the claims of the Network Patents provided improved technical solutions for web server computers and distributed database systems and networks with parallel operational capabilities.

55.     On their face, a POSITA would understand that the claims of the Network Patents are vastly different and directed to an entirely different concept and technological problem from the earlier patent claims invalidated in *Apple*, *Domino's*, and *Olo*.  Exhibit F shows a representative

claim from each of those cases, claim 9 of the '415 patent, and claim 7 of the '587 patent. Unlike the invalidated claims, the claims in the Network Patents are for and improve intelligent web server computers and computer networks and include specific details for implementing and improving the web server computers and networks, which result in a technological improvement to a network of distributed computing systems, including parallel operational capability, because the claimed web server and network is able to achieve improvements in consistency, availability, and partition tolerance.

56.     The preambles of the asserted claims are limiting. For example, claim 1 of the '415 patent includes a preamble that is limiting and that defines the "said web server computer" to which it is directed as "an improved and intelligent web server computer with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities for use in a hospitality market."

57.     The asserted claims of the '415 and '587 patents recite an ordered combination and includes each of the following elements:

- a web server with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities;
- at least one hospitality food/drink ordering software application
- an advanced master database, with its own database API;
- Middleware/Framework Communications Control Software (MFCCS), which enables at least one web server to communicate with at least two remote handheld computers and for multiple modes of contact and multiple communications protocols; and
- at least one external software API, which integrates the hospitality software application and the MFCCS with the Internet and leverages the advanced master database to support learning, updating, and storing multiple communication modes of contact and related operational parameters.

This combination of the above-listed elements in the 'Network Patents overcomes the challenge of simultaneously achieving consistency, availability, and partition-tolerance for a distributed database by changing the preconditions inherent in the environment for which these goals were

typically articulated. For instance, rather than accepting the underlying assumption that there is only a single type of network and network protocol for connecting the devices in a distributed database design, the Network Patents introduce an approach utilizing multi-modes of contact, multi-communication protocols, and parallel operational capabilities for its system, and combines this with the above-listed elements. Accordingly, the Network Patents claim an invention that can effectively achieve consistency and availability, as well as partition-tolerance, for example, such that when a communication link is down in one communication modality or protocol, the system can then utilize another communication modality or protocol that is not down. This combination of elements of claim 1 in each patent is supported in the specification, e.g., in embodiments disclosed at Fig. 10 and at 16:28-43, 18:61-19:3 of the '415 patent and 16:28-43, 18:62-19:4 of the '587 patent, for instance, which teach multi-modes of communication (e.g., instant messaging, text messaging, email, web pages, pages, facsimiles, text to voice, voice to text, and/or touch tone recognition) message, mobile app message, ethernet, paging (e.g., 27MHz/318MHz), Wi-Fi (802.11), and web links), multiple communications protocols (e.g., HTTP, 802.11, Paging, Ethernet, and WAN Wireless protocols), and parallel operational capabilities, together with a MFCCS, linked databases, servers, and handheld devices.

58.     It cannot be reasonably argued that the asserted claims do not claim improvements to the claimed web server computers and networks, such as "improving efficiency and reliability" and/or enabling the web server computer "to further improve its efficiency by using less computer resources and less computing time through the avoidance of attempting communication modes of contact to hospitality entities and/or users and/or for subsequent user hospitality application task requests likely to fail during the operational period of time if attempted again during that time." This eliminating the necessity of continually querying or checking a mode of communication to

be improving the functionality of computers in that its system effectively achieves consistency and availability for real-time searching in a distributed database. That is, it effectively achieves consistency, since one node in the system does not need to check or continually check another node in the system to know that its data is consistent with the data of the other node. Similarly, this limitation effectively achieves availability, since it implies that there is no need to continually be checking if another node is available or not.  Moreover, the claimed inventions effectively provide partition-tolerance through their multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities, whereby a partition in one mode of communication (such as the Internet) can be overcome by communicating over another modality (such as text messaging)..

59.     The Network Patents disclose how the claimed inventions achieve web server improvements in both consistency and availability:

> According to various embodiments of the present invention, messaging (e.g., wireless text messaging and/or wireless instant messaging) and/or text-to-voice functionality may be employed, for instance, in appointment, waitlist, and/or reservation operations. Such functionality might, in various embodiments, involve messaging (e.g., wireless messaging), text-to-voice, and/or two-way interactivity, and/or may involve communication via landline telephones, cellular telephones, and/or wireless devices.

'415 patent at 13:34-43; '587 patent at 13:44-52.

60.     The claimed multi-modal communication is also taught as being performed in parallel with other operations:

> A computer operating to communicate with the entity as discussed herein might, for example, be dedicated to performing such operations. As another example, such a computer might be one performing other tasks (e.g., acting as a web server). It is noted that, in various embodiments, one or more rules may be followed in communicating with the entity and/or the user.

'415 patent at 17:38-44; '587 patent at 17:39-45.  Thus, the above passage expressly ties the consistency and availability achieved in the claimed inventions of the Network Patents to their

multi-modes of communication and provide partition-tolerance.

61.     The Network Patents and their learning/intelligence further disclose the benefits and functionality of its claimed multi-modal communication approach as follows:

> A communications control program monitors and routes all communications to the appropriate devices. It **continuously monitors the wireless network access point and all other devices connected to the network** such as pagers, remote devices, internet Web links and POS software. Any message received is decoded by the software, and then routed to the appropriate device. No user action is needed during operation of the software once the application has been launched.

'415 patent at 10:51-59 (emphasis added); '587 patent at 10:51-59 (emphasis added).

62.     The Network Patents' claimed combinations provided computer improvements and were not routine or conventional in 2005,  This was further confirmed by the patent examiner in the Notice of Allowances issued at the USPTO:

The limitations lacking in the prior art, in combination with the other limitations clearly claimed in the application are novel and unobvious.  Therefore, the Examiner is allowing the case.
Exhibits G – H.

63.     Claim 1 of the '415 patent also has the following limitation and ordered combination which provides an additional, nonconventional inventive concept:

> **Middleware/Framework Communications Control Software (MFCCS) which enables via its centralized system layer architecture** the at least one said web server computer to communicate with two or more remote wireless handheld computers and for multiple modes of contact, multiple communications protocol functionality, integrated with the master database and with the **at least one hospitality food/drink ordering software application;**

This limitation (the "middleware/framework" limitation), including the centralized system layer architecture, recites further technological improvements to computers, improves the web server computer, and is not reciting a routine or conventional element.   The claimed middleware/framework architecture for a food/drink ordering distributed system for the hospitality industry would speed up and simplify the development, testing, deployment, and performance of

the hospitality applications that are built on top of it.  By providing a centralized system layer architecture, multi-modes of contact and multiple communications protocol functionality, which are integrated with the master database and with the at least one hospitality food/drink ordering software application, the "middleware/framework" limitation recites technological improvements to web server computers for food/drink ordering applications in the hospitality industry.

64.     The MFCCS, inclusive of the added "framework" term and its centralized layered architecture, of Figure 10 is a specific technical solution and inventive concept that improves the prior web server computers and is specifically claimed and incorporated into the Network Patents' claims as evidenced in the prosecution history.

65.     Further still, the importance of the centralized layered architecture from the MFCCS framework/platform and which resulted in the eHost system developed by Ameranth to overcome the limitations of web server computers in 2005 was confirmed by Intercontinental Hotels Group:  "It's this platform that allows eHost to function as a single seamless system, despite actually being made up of thousands of individual, customized web portals (one per hotel location)." McNally Decl. at Ex. 3.

66.     Middleware will impact many parts of an application system built atop it and can be a make-or-break factor for the success of such systems, so great care should be undertaken in their design.  Developing a middleware/framework therefore requires the development of a comprehensive   design/framework,   which   provides   the   layer   architecture   for   the middleware/framework and describes its functionality, and the Network Patents provide such a design for a non-routine and unconventional middleware/framework for the hospitality industry.

67.     As stated above, the teachings of Figure 10 were non-conventional, and an inventive concept specifically incorporated into the Network Patents' claims, and with the "how"

shown to a POSITA in the claims themselves and via the figure/architecture itself.

68.     Figure 10 and accompanying disclosures in the specification of the '415 and '587 patents disclose a system diagram, framework and design description for the claimed middleware/framework for distributed food/drink ordering applications in the hospitality industry. *See, e.g.*, '415 patent at Fig. 10, 3:55-64, 14:43-63, 15:27-43, 15:45-49; '587 patent at Fig. 10, 3:52-61, 14:43-63, 15:27-43, 15:45-49; '415 patent at 16:44-64, 16:64-17:7; '587 patent at 16:45-61; 16:65-17:8.  These disclosures describe multiple communication modes, multiple communications protocols and distributed computing components (including a server and multiple clients).  These disclosures are new inventive concepts and are for a non-routine and unconventional middleware/framework for distributed food/drink ordering applications in the hospitality industry.

### c.  A Person of Ordinary Skill in the Art, Dr. Goodrich, Recognized Technological Improvements of the Network Patents' Claimed Inventions and Confirmed Their Non-Conventionality in 2005

69.     Ameranth incorporates in its entirety the Declaration of Michael T. Goodrich, Ph.D. Regarding U.S. Patent Nos 11,842,415 and 11,847,587 ("Goodrich Decl.), attached hereto as Exhibit C, into the pleadings here.

70.     The "web server" of claim 1 of the Network Patents, and as it is defined in the preamble of the claims, was non-conventional in 2005, and is improved and specialized to employ technical improvements, including multi-modes of contact, multi-communications protocols, multi-user, and parallel operational capabilities.  Goodrich Decl. at ¶¶ 33-51.

71.     As confirmed by Dr. Goodrich,

a POSITA would also find ample support for the claimed web server being "[a]n intelligent web server computer" integrated with "an advanced master database" with an "application program interface (API)" that "intelligently learns, updates, and stores multiple communication modes of contact and related operational parameters for hospitality entities and for remote hospitality users along with their prior attributes or preferences, if any and then intelligently applies them," as well as at least one said web server being "programmed with instructions enabled to

31

intelligently choose and apply multiple and different modes of contact and/or different communication protocols."

Goodrich Decl. at ¶ 35.

72.    "[A] POSITA would understand that these [i.e., the following non-routine and unconventional combination of' claimed] components work together as disclosed in the specification" of the Network Patents:

> A POSITA would understand that the claims of the '415 and '587 Patents recite non-routine and unconventional combinations of the following elements:
>
> • a web server with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities;
>
> • at least one hospitality food/drink ordering software application
>
> • an advanced master database, with its own database API;
>
> • Middleware/Framework Communications Control Software (MFCCS), which enables at least one web server to communicate with at least two remote handheld computers and for multiple modes of contact and multiple communications protocols; and
>
> • at least one external software API, which integrates the hospitality software application and the MFCCS with the Internet and leverages the advanced master database to support learning, updating, and storing multiple communication modes of contact and related operational parameters.

*Id.* at ¶¶ 81-82.

73.    A person of ordinary skill in the art would understand the Network Patents' claimed combination of elements provides for the improvement in the functionality of computers and/or networks, such as "improving efficiency and reliability" and/or enabling the web server computer "to further improve its efficiency by using less computer resources and less computing time through the avoidance of attempting communication modes of contact to hospitality entities and/or users and/or for subsequent user hospitality application task requests likely to fail during the operational period of time if attempted again during that time."   Therefore, a POSITA would

recognize that the claimed web server and network improve the functionality of computers and/or computer networks for applications in the hospitality industry, which used a single mode of communication, with a system that utilizes multi-modes of communication and thereby overcomes the limitations of the CAP Theorem challenge. *See* Goodrich Decl. at ¶¶ 55-65.

74.    A person of ordinary skill in the art also would understand the claim elements include explaining "how" to achieve these improvements (e.g., automatically choose and execute alternate communication modes of contact and/or alternate communications protocols if needed and appropriate at the time of execution"). A person of ordinary skill in the art would understand this eliminating the necessity of continually querying or checking a mode of communication to be improving the functionality of computers in that its system effectively achieves consistency and availability for real-time searching in a distributed database. That is, it effectively achieves consistency, since one node in the system does not need to check or continually check another node in the system to know that its data is consistent with the data of the other node. Similarly, this limitation effectively achieves availability, since it implies that there is no need to continually be checking if another node is available or not. Moreover, a person of ordinary skill in the art would understand that the invention effectively provides partition-tolerance through its multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities, whereby a partition in one mode of communication (such as the Internet) can be overcome by communicating over another modality (such as text messaging). *Id.* at ¶ 84.

75.    Claim 1 of the '587 patent recites "wherein the parallel operations capable network is integrated with the MFCCS and the backend servers are programmed with instructions executable to choose and apply varying modes of contact during the same remotely initiated hospitality task, for and with the handheld/mobile customers and/or handheld/mobile equipped

entity staff, to intelligently execute and support completion of the hospitality application task requests." (emphasis added). This technological limitation is a new inventive concept and was not a routine or conventional element in 2005. Further, the claim provides structure regarding how to apply varying modes of contact during the same hospitality task and it also integrates with and leverages the claimed "parallel operational capabilities" of the claimed network. A POSITA would therefore understand that this provides, along with the supportive teachings in the specification, as is explained further herein, the "how" and specific programming guidance, e.g., through "instructions executable to choose and apply varying modes of contact during the same remotely initiated hospitality task." This switching or varying of modes of contact, which occurs during the same hospitality tasks, such as, e.g. switching/varying from email to text and/or back, was new (hence, not routine or conventional). Additionally, dependent claim 12 adds the additional inventive concept that the switching/varying of the modes occurs automatically and based upon learning and rule based intelligence. Thus, these are technological improvements which provide structure to improve the prior computers and also improve the way that prior, conventional networks operated while concurrently addressing and overcoming the CAP Theorem challenges via significant technical improvements to overcome the occurrences of network partitions. The varying between modes of contact, is specifically taught/disclosed in the specification, *e.g.* '587 patent at 14:47-51 ("As another example, the computer might, alternately or additionally, determine a messaging address and/or telephone number of the entity (e.g., via database lookup) and send a message (e.g., of the sort discussed above) in an automated manner to the entity."); *see also, e.g., id*. at 14:58-63 ("It is noted that, in various embodiments, in the case where the computer was not able to successfully reach the entity and/or receive a valid response from the entity, the computer might keep trying and/or try alternate contact modes."); *id.* at 18:23-31 ("Such

synchronization might for instance, be of the sort discussed herein, (e.g. as shown in Figure 10). For example, synchronization might occur between one or more computers that operate to communicate with the user, one or more web servers, one or more web sites, one or more cell phones (e.g. smart phones) and or PDAs and/or one or more back office servers (central databases).").  Further, these specific network architectural teachings to a POSITA comprise new continuation-in-part material teachings, which provide the programming guidance as is clearly stated in the specification. *See, e.g., id.* at 18:33-36. ("It is noted that such computers, servers and/or web sites may for example, employ software programmed to employ one or more of the operations discussed above.").  Further, these are the specific operations discussed above, because the inventor defined them as such via the limitations and scope of these claims, and which are defined within the claims themselves. Thus, it is clear to a POSITA that the inventor identified prior conventional systems and their problems and taught and claimed technological improvements to them.

76.     The inventions of the Network Patents are not tied to a specific computer programming language.  Goodrich Decl. at ¶ 93 ("The specification advantageously teaches and discloses that its invention is not tied to a specific computer programming language, such as Visual Basic, SQL, or C++.").

77.     More specifically,

98.     Given this disclosure, a POSITA would understand that embodiments can be written in any commonly used computer language, such as Visual Basic, C++, or SQL. Thus, a POSITA would understand that it is sufficient for the specification to describe its algorithms in prose or *pseudocode*, which is a plain language description of the steps in an algorithm, which is written primarily for humans not machines. *See, e.g.,* the '415 Patent at 8:35-42, 9:22-50, 10:29-50, 14:22-63, 15:13-51, 16:44-17:2, and 17:20-37; '587 Patent at 8:35-42, 9:2-50, 10:29-50, 14:22-63, 15:13-52, 16:45-17:3, and 17:21-38, for example algorithm descriptions. In fact, there are multi-faceted advantages to not limiting an invention to a particular software language via the inclusion of language specific, source code in a patent

application, and as a repeated inventor myself, with multiple issued patents, I would not do so. For example, when it is considered that over the 20-year life of patents, computer languages are continually evolving and advancing..

*Id.* at ¶ 98.

78.    The Network Patents provide pseudocode for an exemplary algorithm for building a menu file structure:

> The steps taken in building a menu are as follows:
> 1. Add Modifiers;
> 2. Add Sub-Modifiers and link them to the Modifiers;
> 3. Create Menu categories;
> 4. Add menu items to the categories;
> 5. Assign Modifiers to the menu items;
> 6. Preview the menu on the POS emulator on the desktop PC;
> 7. Download the menu database to the handheld device.

*Id.* at ¶ 102; *see also* '415 patent at 8:34-41; '587 patents at 8:34-41.

79.    The '415 and '587 patents specification includes

> numerous examples from the newly added material and repeated references to Figure 10 and its framework, which provide the "how" and programming guidance to a POSITA, while also identifying specific exemplary technologies and embodiments for realizing updating and querying, including a client-server system ('415 Patent at 19:13-58 and '587 Patent 19:12-59) utilizing client and server devices employing an advanced master database ('415 and '587 Patents at 11:64-65), Hypertext Transfer Protocol, HTTP ('415 Patent at 18:61-19:2; '587 Patent at 18:62-19:3), Hypertext Mark-up Language, HTML (*id.* at '415 Patent at 19:3-7 and '587 Patent at 19:4-8), Extensible Mark-up Language, XML (*id.* at '415 Patent at19:7-13 and '587 Patent at 19:8-14), Structured Query Language, SQL (*Id.* at 12:3-6), ActiveX Data Objects, ADO (*Id.* at 11:7-12:3), graphical user interfaces, GUIs (*Id.* at Figs. 1-8, 6:18-59, 7:16-50-, 11:3-25, 13:61-14:9). In my opinion, a POSITA in 2005 would not have considered this suite of technologies to be a set of generic components and certainly not in their ordered combination as in the claims, (inclusive of the multiple, new 'inventive concepts' as defined above), but rather to be specific technologies for realizing an improved and specialized distributed client-server system for food/drink ordering applications which is further enhanced via the claimed combination of above-cited elements of claim 1.

Goodrich Decl. at ¶ 103.

80.    Confirming the claims of the Network Patents in view of the specification

sufficiently disclose "how" the result is achieved, a POSITA would know how to develop source code "given the clear structure disclosed, e.g., with respect to the above-cited technology and algorithmic teachings from the specification/figures, as well as the claims themselves." *Id.* at ¶¶ 104-111; *see also id.* at ¶¶ 91-100.

81.    "[A] POSITA in 2005 would not have considered this suite of technologies to be a set of generic components and certainly not in their ordered combination as in the claims, (inclusive of the multiple, new 'inventive concepts' as defined above), but rather to be specific technologies for realizing an improved and specialized distributed client-server system for food/drink ordering applications . . . . *Id.* at ¶ 103; *see also id.* at ¶ 39 ("[A] POSITA would understand that, rather than being only a generic, conventional computer, the improved 'web server' of claim 1, and as it is defined in the preamble is specialized to employ technical improvements, including multi-modes of contact, multi-communications protocols, multi-user, and parallel operational capabilities, which is supported by the specification.").

## DOORDASH BACKGROUND

82.    DDI was formed in 2012 by four Stanford students, Evan Charles Moore, Andy Fang, Stanley Tang and Tony Xu, who is the CEO today.  Initially, understandably and admittedly, like most startups, they had little technology, nor experience nor the vision for the technology needed for a true, enterprise scale, system as DoorDash has become today.  But they did have drive and vision and through that, they have become the number one food delivery company in the U.S. and in the world.  As explained below, over time, DDI and its engineering team realized that they needed an integrated  web server-based solution, inclusive of the teachings of the Network Patents and their claims.

83.     Below is a snippet of a screenshot from a video posted by DDI and entitled "DoorDash Technical Showcase Event- Logistics Team" (available at https://www.youtube.com/watch?v=Um_s0AUjZd4 (last accessed Dec. 20, 2023):



84.     The article "Future-proofing: How DoorDash Transitioned from a Code Monolith to a Microservice Architecture" (available at https://doordash.engineering/2020/12/02/how-doordash-transitioned-from-a-monolith-to-microservices/ (last accessed Dec. 20, 2023), contains the following text (bullet points added), reordered for purposes of this complaint:

- "DoorDash began its venture into food delivery in 2013.  At that time, the mission from an engineering standpoint was to build a fast prototype to gather delivery orders and distribute them to a few businesses through basic communication channels like phone calls and emails.  The application would need to accept orders from customers and transmit those orders to restaurants while at the same time engaging Dashers to pick up orders and deliver them to customers."

- "Although the monolithic architecture was a valid solution to enable agile development in the early phases, issues started emerging over time.  This is a typical scenario in the lifecycle of a monolith that occurs when the application and the team building it cross a certain threshold in the scaling process.  DoorDash reached this point in 2017, which was evident by the increasing challenge of building new functionalities  and extending the framework.

     Eventually, the DoorDash application became somewhat brittle.  New code sometimes caused unexpected side effects.  Making a seemingly innocuous

38

change could trigger cascading test failures on code paths that were supposed to be unrelated."

- "*In 2019, DoorDash's engineering organization initiated a process to completely reengineer the platform on which our delivery logistics business is based.*"

- "Originally developed as a monolithic codebase, the company's business growth in 2019 unveiled the weaknesses of our development model, including issues such as growing developer ramp up time, longer waits for test completion, and overall higher developer frustration as well as increased brittleness of the application. After some debate, the company began planning to transition the monolith to a microservice architecture."

- "After these phases, a multi-layered microservice architecture emerged:



"

85.    Per the prior paragraph, DDI's technical problems that needed to be solved in the mid- to late 2010s were solved by DDI's "multi-layered microservice architecture," which is DDI's version of the MFCCS and layer approach claimed in the Network Patents.  Thus, DDI made a 2019 factual admission that the layered framework/architecture of the Network Patents' claims improved computers and thus was surely not conventional much earlier in 2005. This admission

is further confirmed by DDI's parallel activities to seek to patent such technology for itself, as is further detailed below.

86.    The article "2020 Hindsight: Building Reliability and Innovating at DoorDash" (available at https://doordash.engineering/2020/12/23/2020-engineering-highlights/ (last accessed Dec. 20, 2023)), includes the following text (bullet points added):

- "Highlights from this year include work on our microservices architecture and migrating business logic, a process begun in 2019, improving our reliability metrics on a platform facilitating millions of deliveries per day. To support the many data-driven aspects of our business, we built new pipelines and found other ways to improve our data infrastructure's speed, reliability, and usability."

- "The continued growth of DoorDash's business brought us to the realization in 2019 that we needed to fundamentally re-architect our platform. Our original monolithic codebase was stressed from the need to facilitate millions of deliveries per day, while a growing engineering organization meant hundreds of engineers working to improve it. To support our scale, we began migrating from the original codebase to a microservices architecture, work that continues through 2020, improving reliability and developer velocity."

87.    After recognizing its own technological problems as discussed above and then envisioning what was needed to address them, DDI not only initiated technical developments, but it also sought patent protections for the concepts they believed to be new and non-conventional as of 2019-2022. DDI has publicly acknowledged its valuing and support of the U.S. patent system, including in its own SEC Form 10-K Annual Statement, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001792789/628c3275-56ed-4bc8-a246-20e7c40742ce.pdf, and it now owns over 40 patents, many of which, (including the two patents further identified below) that include copied and/or complementary technology as to that disclosed and claimed in the Network Patents' claims. DDI has vigorously argued the patent eligibility of its own patents, including its copying of many technical aspects of the Network Patents as is exemplified in Exhibits I and J attached hereto.

88.     DDI filed for and was awarded multiple patents for inventive concepts it believed it was the first to invent and the inventors of the claimed inventions in those patents signed sworn statements attesting to those beliefs.

89.     However, DDI and the inventors of DDI's patents were wrong, because Ameranth had invented many of those concepts long before they did, and DDI's filing for and receiving these patents are direct admissions that Ameranth's Network Patents' inventive concepts were improvements to computers and were thus not conventional 16+ years earlier in 2005.

90.     That the inventive concepts claimed in the Network Patents provide non-abstract, technical solutions to technical problems that improve computers is further confirmed by DDI itself by its repeated statements when prosecuting the patents identified below and through the disclosures, inventors' admissions and statements within those patents themselves, all of which rely on, in part or in whole, key aspects of the Network Patents' related technology improvements.

91.     As evidenced in bold text below, each of DDI's following two patents include various aspects of the inventive concepts of the Network Patents' claims, and include multiple admissions that these same features improved computers and provided the same platform as claimed in the Network Patents.  These specification statements along with the inventors' sworn declarations, attached hereto as Exhibits K-L, wherein they each swore under oath that they believed they were the original inventors of many of the same elements and other inventive concepts of the Network Patents' claims, are factual evidence that these elements and inventive concepts were not conventional in 2005.  In fact, these inventors and DDI itself via filing and prosecuting these applications and seeking patents for these concepts indisputably admitted and confirmed that the subject matter they are directed to and for which they much later duplicated into these applications, and now in 2023 had issued as patents, were and are computer

improvements, network improvements, improved user interfaces and since their priority date is almost 15 years behind Ameranth, they clearly were not conventional back in 2005.  Further, the admissions/statements herein are yet further evidence of their infringement of the Network Patents.

    a.   U.S. Patent No. 11,657,442, entitled "Method, Medium, and System for Integration of Functionality of a Fulfillment Service Provider into Third-Party Application," filed on November 11, 2021, issued on 23, attached hereto as Exhibit I (emphasis added):

Abstract:  Integrating a fulfillment service provider into a third-party application via an Application Programming Interface (API) is described. In an example, a computing device associated with a fulfillment service provider can determine, based at least in part on an indication of an interaction between a user and a third-party application, that the fulfillment service provider has been initialized. In one example, functionality associated with the fulfillment service provider can be accessible to the third-party application via an API. In at least one example, the computing device can generate, based at least in part on the interaction with the third-party application and while the fulfillment service provider is initialized, a recommendation of at least one of a service, a merchant, or an item associated with the fulfillment service provider. The computing device can cause the recommendation to be presented via at least one of the third-party application or the fulfillment service provider.

Col. 3, l. 53 – col. 4, l. 26:  As will be described below, **techniques described herein can be implemented via a communication network that enables third-party applications to communicate with server(s) that are associated with a fulfillment service provider**. **Techniques described herein thus utilize the technical capability of such a communication network** to enable the integration of services and/or functionalities that are available via different service providers into a single access point. That is, as described herein, **techniques utilize API(s) to enable third-party applications to integrate services and/or functionalities of a fulfillment service provider**. For instance, individual third-party service providers can utilize API(s) and/or a software developer kit (SDK) provided by the fulfillment service provider to allow third-party developers to include fulfillment service provider functionality and/or avail fulfillment service provider services in association with their own third-party applications. **That is, the API(s) and/or SDK can enable third-party developers to customize how their respective third-party applications interact with the fulfillment service provider. The third-party applications can exchange data with the server(s) that host the**

**fulfillment service provider, using the technical capabilities of communication networks**, to provide such functionality and/or services. In many examples, as described below, the use of fulfillment service provider functionality and/or services can be dynamic and individualized for each of the third-party applications, **thereby providing more efficient use of functionalities and/or services available via the fulfillment service provider. As such, techniques described herein are directed to improved performance of computing systems**.

Col 4, ll. 52-66:  For instance, if a user is watching a video via a content providing application and wants to order a pizza, the user is required to exit the content providing application, determine a service that would deliver the pizza, and then open another application for ordering the pizza. **Such a transition causes friction for users and, additionally, consumes computational resources, as described below. That is, existing capabilities of computing devices are inefficient. Techniques described herein provide a specific improvement in the capabilities of computing devices**. For instance, instead of requiring a user to open two separate applications to access two different services, such is the case with existing capabilities of computing devices, techniques described herein are directed to the integration of services and/or functionalities via API(s).

Col 5, ll. 4-8:  That is techniques described herein **improve the efficiency of using computing devices** by bringing together functionalities of multiple service providers **via a common access point, using for example, API's.**

Col 5, ll. 12-17:  Thus, techniques described herein **reduce friction caused by existing capabilities of computing devices and reduce computational resources required for availing services and/or functionalities from multiple service providers to users. As such, techniques described herein can offer an improvement in the functioning of computing devices**.

Col. 6, ll. 22-25:  The fulfillment module **108** can present recommendations to patrons via the **fulfillment user interface 114 (e.g., via push notifications, interstitials, deep links, text messages, or the like)**. The recommendation can be interactive to allow the user to engage with the recommendation while in the third-party application.

Col 8, ll. 59-65:  In at least one example, a recommendation module **126**, which can be included in the fulfillment module **108**, **can generate the recommendations and/or cause the recommendations to be presented to the user(s), e.g., via push notifications, interstitials, deep-links, text messages, or the like**. Additional details are described below.

Col. 11, ll. 50-60:  In an additional or alternative example, the recommendation can be presented **via the fulfillment service provider**.

That is, in such an example, **the recommendation** can be presented **via another channel** associated **with the fulfillment service provider instead of, or in addition to, the third-party application 104**. The recommendation can be sent to the user **via a push notification, interstitial, a deep-link, a text message, or the like**. The recommendation can be interactive to allow the user to engage with the recommendation while in the third-party application.

Col. 12, ll. 15-21:  If the user does not desire to take an action based on the recommendation, the fulfillment module **108 can refrain from performing additional operations (e.g., take no action)**, as illustrated in block **216**. In some examples, the interactions or lack thereof **can be used to feed into the machine learning models that make the recommendations**.

Col. 16, ll. 49-56:  If the event details are not updated, the recommendation can continue to be presented **until the recommendation module 126 determines to terminate the recommendation (e.g., after a lapse of a predetermined period of time, etc**.) or the user otherwise interacts with the third-party application **104** (e.g., takes an action based on the recommendation, closes the third-party application **104**, exits the third-party application, etc.).

Col, 40, ll. 38-48:  **Further, while the figures illustrate the components and data of the server(s) 1504 as being present in a single location, these components and data can alternatively be distributed across different computing devices and different locations in any manner. Consequently, the functions can be implemented by one or more server computing devices, with the various functionality described above distributed in various ways across the different computing devices. Multiple server(s) 1504 can be located together or separately, and organized, for example, as virtual servers, server banks and/or server farms**.

Col. 42, l. 63 – col. 43, l. 5:  **In at least one example, the system 1500 can include a datastore 1544 that can be configured to store data that is accessible, manageable, and updatable**. In some examples, the datastore **1544** can be **integrated with the user device 1502 and/or the server(s) 1504. In other examples, as shown in FIG. 15, the datastore 1544 can be located remotely from the server(s) 1504 and can be accessible to the server(s) 1504. The datastore 1544 can comprise multiple databases and/or servers connected locally and/or remotely via the network(s) 1506.**

Col. 44, ll. 35-45:  **Furthermore, the methods described above are illustrated as collections of blocks in logical flow graphs, which**

**represent sequences of operations that can be implemented in hardware, software, or a combination thereof. In the context of software, the blocks represent computer-executable instructions stored on one or more computer-readable storage media that, when executed by processor(s), perform the recited operations**. **Generally, computer-executable instructions include routines, programs, objects, components, data structures, and the like that perform particular functions or implement particular abstract data types.**

b. U.S. Patent No. 11,710,172, entitled "Dynamically Providing Context-Based Notification and Fulfillment," filed on April 15, 2021, issued on July 25, 2023, attached hereto as Exhibit J (emphasis added):

Abstract:  In some examples, a location of a merchant is updated as the merchant moves. A server receives the location of the merchant, and compares that location to the location of a user, so as to determine whether the merchant is located within a first threshold distance or a second, smaller threshold distance from the location of the user. If the user is within the first threshold distance, the server presents a first point of sale (POS) interface to initiate an order from the merchant and present the user with an option to fulfill that order through delivery. If the merchant is located within the second, smaller threshold distance from the user, the server presents the user with a second POS interface that gives the user an option to fulfill the order through pickup instead of delivery."."

Col. 2, ll. 31-38:  The present disclosure relates to systems and methods for dynamically determining whether and how to provide notification to a customer of a changeable remote location of a merchant, and fulfillment options for vending products from that merchant to a customer. In one embodiment, **a network of one or more merchants** offers products for sale via a common application or interface that communicates with a third party server.

Col. 2, ll. 52-56:  **The notification may be displayed on the customer device** in a manner that allows the customer to see the identity of the merchant and/or their products, and to make a purchase for later pick up or delivery. In a similar manner, the merchant device **may receive appropriate notifications** of relevant customers in a merchant's proximity.

Col. 2, ll. 60-66:  In some embodiments, the virtual boundary may a geo-fence that bounds a geographic area around a particular device. In some embodiments, the virtual boundary may be drawn (or set) **with consideration of other contextual factors, such as past purchases, a**

45

**customer's indicated interest, a merchant's route, a merchant's intended marketing plan, or any other appropriate factor that may provide contextual information** regarding the users within the geographic area in which the merchant intends to travel.

Col. 3, ll. 15-23:  This determination may be **based on a user's previous purchases or actions, current conditions (like time, weather, or traffic), merchant saturation indicators in the target area(s), customer interest indicators (e.g., a preference in cuisine or price range) provided by the customer or obtained from a third-party system**, and the like. In some embodiments, **a determination** of customer interest **may be predictive, deterministic**, and/or based on a classification of users in accordance with one or more user characteristics.

Col. 3, ll. 35-38:  Alternate embodiments are also contemplated where an opposite flow is implemented, that is, **notifications of customers are provided to a merchant, such notifications happening additionally or alternately to notifications to customers**. In such embodiments, **notifications to one or more merchants may happen contemporaneously with, serially to, or otherwise at a separate time from notifications made to customers.**

Col. 4, ll. 4-12:  In some embodiments, the disclosed methods and systems send, to a merchant device, **a notification of relevance (e.g., based on proximity, time, customer or merchant preferences, etc.)** of one or more customers, **such notification being customizable to a particular subset of the merchant's customer base**. In one such embodiment, a merchant-facing user interface may allow the merchant to **identify one or more "loyal" customers, for example those who make repeated purchases from the merchant**. **A fulfillment server** may then notify the merchant when the merchant moves to a location that is in proximity to one or more of those loyal customers.

Col. 4, ll. 20-29:  In another embodiment, the disclosed methods and systems compile and/or aggregate and present, to a merchant device, information regarding one or more customers. In one such embodiment, after a notification of proximity has been sent to customers, the customers who express interest in making a purchase may be determined. This information may be summarized and transmitted to the merchant. **In some embodiments, prior to the transmission of a notification of proximity, information regarding the customers and/or their predicted interest in the merchant and its products (a customer profile), a selected location (a location profile), and/or current conditions (a condition profile), and the merchant themselves (a merchant profile) may be analyzed** in order to generate location, route, and/or product recommendations to the merchant.

Col. 4, ll. 34-49:  In some embodiments, this recommendation or aggregated data **may be presented to the merchant in a variety of forms**, such as **a dashboard or graphical format, or as a suggestion for one or more actions to be taken by the merchan**t, for instance a suggested location or route for sale of their products, or a suggested product that is predicted to be successful in a particular market or geographic area.

Col. 5, ll. 5-9:  **The technology herein** employs **a plurality of computing devices, such as mobile devices, to provide targeted and automatic recommendations** of merchants and/or products to customers based on proximity **or other relevant context**, without customers having to perform search or filtering of merchant's and/or their products.

Col. 5, ll. 17-22:  **As a further result of the technology described herein**, there may be **an interaction of multiple computing devices to expedite a fulfillment process** by dynamically determining which of several fulfillment options (e.g., pickup, delivery, both) may apply given a changeable proximity between the merchant and the customer (e.g., a moving food truck), or overall network efficiency.

Col. 5, ll. 28-45:  **This technology** may also provide **a highly-customizable interface for specifying fulfillment options based on practical and/or conditional considerations**, including merchant **and customer preferences**, current environmental and geographic conditions, **the availability of transient or time-sensitive fulfillment options**, such as third-party assistance, among other considerations. That is, the systems and methods described herein may also provide a way of determining real-time locations of one of more entities involved in the fulfillment or an order, and displaying a graphical user interface to any of a customer, a merchant, or a courier, that automatically provides an indicator of such real-time locations, and/or automatically provides, in dependency of such real-time locations, dynamic options for fulfillment of an order. By these means, the user customer, merchant, or courier is presented **with an improved user interface for electronic devices.**

Col. 5, ll. 50-57:  Additionally, the systems and methods described herein further provide **the ability to receive, via a user interface, a customer selection of an order**, to determine, based on real-time location determining systems, locations of one or more mobile entities with changeable locations (such as merchant systems, customer systems, and in some embodiments third party systems such as couriers), **and/or to automatically coordinate and monitor location-based fulfillment between the mobile entities**.

Col. 6, ll. 23-38:  Merchant system **24** may include **a device 20 such as a mobile phone such an iPhone or Android device, an iPad or tablet device**, a laptop, or touchscreen device, **though any practical device that**

**can communicate with the network 30 may be appropriate**. In the embodiment of FIG. **1** , merchant system **24** includes a payment reader **25** illustrated as a standalone mobile hardware device, though the configuration is not so limited. In other embodiments, the payment reader **25** may be integrally incorporated into the merchant device **20**, for instance **where the merchant device 20 is a smart phone (iOS or Android) or another computing device** that is configured to act as an embedded card reader (ECR). In still other embodiments, reader **25 may be presented as software (such as an application installed on a mobile device),** hardware, or any combination thereof in another component of environment **10**.

Col. 7, ll. 8-21:  **A customer device 40 may be any device operated (or operable) by a customer** that is able to communicate with the merchant device **20** and  **a central server 50 (described further herein) via the network 30**. The term "customer" (also referred to herein as a "user" (of a POS system), a "purchaser" or the like) may be any individual or entity that may purchase or intend to purchase a product or service of a merchant, or may be potentially interested in purchasing a product or service of a merchant. **A customer device 40 may be, for instance, a mobile phone such as an iPhone or Android device, an iPad or tablet device**, a laptop or touchscreen device, a PC or stationary computing device, **or any other practical device that can communicate via the network** 30.

Col. 7, l. 66 – col. 8, l. 8:  **Environment 10 may also include one or more servers** 50.  **A server 50 is, in some embodiments, remote to the merchant device 20 and customer devices 40 but is capable of transmitting and receiving information therewith via the network 30**. In the embodiment of FIG. **1** , **remote server 50 is a mobile fulfillment server (also referred to herein as "fulfillment server") capable of processing and transmitting data to, from, and between merchant device 20 and customer device 40 to facilitate sales transactions in a manner described in greater detail below.**

Col. 8, ll. 48-65:  **In some embodiments, fulfillment server 50** may, upon a determination of proximity with the merchant device **20**, **present to a customer device 40 a customer-facing user interface (e.g., a graphical user interface) that displays a notification of proximity to the merchant**. In some embodiments, **this notification may prompt the customer device 40 to transmit an indication of interest in making a purchase from (or otherwise interacting with) the merchant. In some embodiments, the fulfillment server 50 may then present to the customer device 40 a user interface** through which the customer can purchase or order a product from the merchant; viz., **fulfillment server 50 may provide one or more components of a POS system between the merchant and the custome**r. In some examples, **fulfillment server 50 may transmit order information to the merchant**

**device 20 via a merchant-facing user interface, email, instant messaging, or other type of electronic communication, or via voice, SMS, voicemail, or any other appropriate type of communication.**

Col. 9, ll. 16-34:  **The fulfillment server may then deliver different sets of data to each of the respective customers** detailing fulfillment options specific (though not necessarily unique) to that customer. **For instance, fulfillment server 50 may present to customer device 40-1, via a user interface, two fulfillment options: pickup and delivery, and may present to customer device 40-1, via a user interface, only one fulfillment option, e.g., one of pickup or delivery**. By these means, **different sets of fulfillment data are sent to different customer devices, based on the devices' location and/or other relevant factors (that is, other context data)** described in greater detail below. In some embodiments, merchant device **20** and one or more of customer devices **40-1** and **40-**2 may also transmit data directly to and between each other, for example, transaction data regarding an order made by the customer from the merchant, or message data regarding the status of an order or of fulfillment.

Col. 9, ll. 35-49:  **Fulfillment server 50 transmits and/or receives location data, notification data, fulfillment data, profile/preference data, etc. to/from one or more of the merchant device 20 and the customer devices** 40-1 (belonging to customer **44**) and **40-2** (belonging to customer **46**). **These types of data transmission, performed over the network 30, are illustrated in FIG. 1 as solid lines passing through network 30.** Network 30 may **include one or more of any appropriate network, including a wide area network (such as the Internet), a local area network (such an intranet), a cellular network or another type of wireless network, such as Wi-Fi, Bluetooth, Bluetooth Low Energy, and/or other close-range wireless communications, a wired network, such as fiber optics and Ethernet, or any other such network, or any combination thereof.**

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,842,415

92.   Ameranth repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

93.   Without license or authorization and in violation of 35 U.S.C. § 271(a), Defendants are liable for infringement of at least claims 1 and 9 of the '415 patent by making, using, importing, offering for sale, and/or selling, (a) an improved and intelligent web server computer with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities

for use in a hospitality market and (b) a network of interconnected, intelligent and improved web server computers with multi-modes of contact, multi-communications protocols, multi-user and parallel operational capabilities for use in a hospitality market, respectively, (collectively, the "Accused Instrumentalities"), because each and every element is met either literally or equivalently.

94.    Upon information and belief, Defendants have used and tested the Accused Instrumentalities in the United States, directly infringing one or more claims of the '415 patent.

95.    The Accused Instrumentalities satisfy each and every element of each asserted claim of the '415 patent, either literally or under the doctrine of equivalents.   Exemplary preliminary claim charts illustrating infringement of claims 1 and 9 are attached hereto as Exhibits M1-M2, and incorporated herein by reference.

96.    In addition to the extensive and detailed infringement chart, backed by 100+ evidentiary citations attached thereto, including extensive and detailed technical video presentations and case studies directly from the Defendants, DDI has admitted to infringement in various public statements, not only as detailed in the extensive claims chart, but as shown below via an August 2022 interview of DDI's Vice President of Analytics and Data Science, Jessica Lachs, and when combined with the DDI's post about its recently created Iguazo "Big Picture" framework/architecture pictorially reflecting its infringement of the '415 patent claims. The Iguazo "Big Picture"(further illuminated by the statements by Ms.  Lachs and many other DDI engineering team leaders and developers as is shown in the evidence attached to the preliminary claim chart) clearly demonstrates, explains, and admits to Defendants' infringement of the '415 patent claims and is further explained as to the Iguazo system diagram below.

97.     In the interview, a video of which is attached as Exhibit 98 to the preliminary claim chart and also available at https://www.youtube.com/watch?v=g-1MaOCFgUc (last accessed Dec. 20, 2023), DDI's Vice President of Data Science admits:

- "And so for us, it's really about collecting as much information as we can about all sides of the marketplace, bringing all of that data together into a central data platform, where all of that data is accessible no matter the source. Whether it is coming from our production systems, transactional data, whether it is event data in our apps, whether that's the consumer app, the dasher app, the merchant app . . . whether it is coming from our CRM systems. All of that data needs to come in to one central place so that we can tie it together and use the insights together to create a 360 degree picture of what's happening on our platform and off our platform so that we can use that information not just to provide accurate menus and inventory for consumers but also so we can send the right email communications to consumers, to dashers, so that we really have a full picture of what's happening and can use that for personalization and to help all three sides of our marketplace really optimize that they are at their peak efficiency."

- "So, for us, we want data to be easily accessible to all the different teams that need access to it.  Analytics, being one of the largest customers of data at DoorDash, of course, but the way we think about our data models is really about increasing accessibility and consistency to that data.  So, having all of our data in one central place and making sure that it is high in performance and so like query speeds are fast and that data models are thoughtful, so that it makes it a lot easier for data scientists, analysts, operators, product managers to be able to query the data that is needed and use the data in our production, in our production systems as well.  So, we try to be thoughtful about how we structure our data models and how we ensure that all of the different production systems tie together into that central, as you mentioned, that central data lake."

98.     In the post "Building Scalable Real Time Event Processing" (available at https://www.youtube.com/watch?v=BqbN-DD24SE (last accessed Dec. 20, 2023)), a lead engineer at DDI working on its real-time data infrastructure showed the "architectural overview of Iguazu."  As a POSITA would understand, the Iguazo system diagram shows the DoorDash platform and "360 degree picture," and as illuminated by many other DDI technical statements, papers, admissions and presentations in the attached exhibits, it depicts the framework and layered architecture of the '415 patent claims, clearly operating with/on clusters of the claimed web servers

and including its master database as is shown on the far right, the hospitality tasks from, e.g., consumers and Dashers and food importation inputs from the restaurants on the far left (i.e. their external clients) and the integration, API's communication protocols, and intelligence of the claimed '415 patent inventions in the center and including the interactivity and integration of the system elements in their ordered combination.



99.     Ameranth is entitled to recover from Defendants the damages sustained by Ameranth as a result of Defendants' infringement of the '415 patent in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 11,847,587

100.     Ameranth repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

101.    Without license or authorization and in violation of 35 U.S.C. § 271(a), Defendants are liable for infringement of at least claims 1 and 7 of the 587 patent by making, using, importing, offering for sale, and/or selling, an intelligent back office and handheld/mobile distributed computing network with varying, multi-modes of contact, and parallel operational capabilities for use in completing remotely initiated hospitality tasks in the hospitality market (collectively, the "Accused Platform"), because each and every element is met either literally or equivalently.

102.    Upon information and belief, Defendants have used and tested the Accused Platform in the United States, directly infringing one or more claims of the '587 patent.

103.    The Accused Platform satisfies each and every element of each asserted claim of the '415 patent, either literally or under the doctrine of equivalents.  Exemplary preliminary claim charts illustrating infringement of claims 1 and 7 are attached hereto as Exhibits M3-M4, and incorporated herein by reference.

104.    In addition to the extensive and detailed infringement chart, backed by 100+ evidentiary citations attached thereto, including extensive and detailed technical video presentations and case studies directly from the Defendants, DDI has admitted to infringement in various public statements, not only as detailed in the extensive claims chart, but as shown below via an August 2022 interview of DDI's Vice President of Analytics and Data Science, Jessica Lachs, and when combined with the DDI's post about its recently created Iguazo "Big Picture" framework/architecture pictorially reflecting its infringement of the 587 patent claims. The Iguazo "Big Picture"(further illuminated by the statements by Ms.  Lachs and many other DDI engineering team leaders and developers as is shown in the evidence attached to the preliminary claim chart) clearly demonstrates, explains, and admits to Defendants' infringement of the '587 patent claims and is further explained as to the Iguazo system diagram below.

105.    In the interview, a video of which is attached as Exhibit 98 to the preliminary claim chart and also available at https://www.youtube.com/watch?v=g-1MaOCFgUc (last accessed Dec. 20, 2023), DDI's Vice President of Data Science admits:

- "And so for us, it's really about collecting as much information as we can about all sides of the marketplace, bringing all of that data together into a central data platform, where all of that data is accessible no matter the source. Whether it is coming from our production systems, transactional data, whether it is event data in our apps, whether that's the consumer app, the dasher app, the merchant app . . . whether it is coming from our CRM systems. All of that data needs to come in to one central place so that we can tie it together and use the insights together to create a 360 degree picture of what's happening on our platform and off our platform so that we can use that information not just to provide accurate menus and inventory for consumers but also so we can send the right email communications to consumers, to dashers, so that we really have a full picture of what's happening and can use that for personalization and to help all three sides of our marketplace really optimize that they are at their peak efficiency."

- "So, for us, we want data to be easily accessible to all the different teams that need access to it.  Analytics, being one of the largest customers of data at DoorDash, of course, but the way we think about our data models is really about increasing accessibility and consistency to that data.  So, having all of our data in one central place and making sure that it is high in performance and so like query speeds are fast and that data models are thoughtful, so that it makes it a lot easier for data scientists, analysts, operators, product managers to be able to query the data that is needed and use the data in our production, in our production systems as well.  So, we try to be thoughtful about how we structure our data models and how we ensure that all of the different production systems tie together into that central, as you mentioned, that central data lake."

106.    In the post "Building Scalable Real Time Event Processing" (available at https://www.youtube.com/watch?v=BqbN-DD24SE (last accessed Dec. 20, 2023)), a lead engineer at DDI working on its real-time data infrastructure showed the "architectural overview of Iguazu."  As a POSITA would understand, the Iguazo system diagram shows the DoorDash platform and "360 degree picture," and as illuminated by many other DDI technical statements, papers, admissions and presentations in the attached exhibits, it depicts the framework and layered architecture of the '587 patent claims, clearly operating with/on clusters of the claimed web servers

and including its master database as is shown on the far right, the hospitality tasks from, e.g., consumers and Dashers and food importation inputs from the restaurants on the far left (i.e. their external clients) and the integration, API's communication protocols, and intelligence of the claimed '587 patent inventions in the center and including the interactivity and integration of the system elements in their ordered combination.



107.    Ameranth is entitled to recover from Defendants the damages sustained by Ameranth as a result of Defendants' infringement of the '587 patent in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Ameranth hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Ameranth requests that this Court enter judgment against Defendants as

follows:

A.   An adjudication that Defendants have infringed the '415 and '587 patents;

B.   An award of damages to be paid by Defendants adequate to compensate Ameranth for Defendants' past infringement of the '415 and '587 patents and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.   A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Ameranth's reasonable attorneys' fees; and

D.   An award to Ameranth of such further relief at law or in equity as the Court deems just and proper.


Dated:  December 22, 2023          */s/ Vincent A. Coppola*
                                   Vincent A. Coppola
                                   PRIBANIC & PRIBANIC
                                   513 Court Place
                                   Pittsburgh, PA 15219
                                   Telephone: (412) 281-8844
                                   Facsimile:  (412) 281-474

                                   Richard C. Weinblatt (*pro hac vice* to be filed)
                                   Stamoulis & Weinblatt LLC
                                   800 N. West Street, Third Floor
                                   Wilmington, DE 19801
                                   Telephone: (302) 999-1540
                                   Facsimile:  (302) 762-1688

                                   *Attorneys for Plaintiff*
                                   *Ameranth, Inc.*